Nott, J.,
dissenting:
This is a very curious case; and more curious in its result than in its inception.
In 1858 a Mr. H. W. Green died in Mississippi, leaving a widow and four little children, the youngest literally a babe unborn. The father having died intestate an administrator of his estate was appointed. Like other administrators he was the legal custodian for the time of the property, and derived whatever right, title, power, and authority he had from the appointment of a probate court.
Whether the widow had anything to do with the selection of the administrator, I do not know; but the little children could hardly be held responsible by the most technical of jurists, and certainly the youngest of the family — even from the Supreme Court’s point of view — could have had very little to say about it.
As these children did not live in the Middle Ages, it cannot be supposed that they were affected by sorcery or witchcraft or magic, nor that they were infected by any damnable heresy; and as their father died some years before his helpless little family were plunged into the caldron of the civil war, and *209 nothing appears against him positively or constructively, it cannot be supposed (laying the Constitution aside for the moment) that attainder of their ancestor had worked corruption of their blood. Nevertheless these children — the eldest not twelve years of age when the wax ended — cannot be heard at the bar of this court; and the reason they cannot be heard is because it was the will of Congress, as expressed in the Bowman Act, that in this and all kindred cases the right of the widow and next of kin to be heard and to recover should be dependent upon the loyalty of an administrator whom they did not appoint, whom they could not control, and whom they were powerless to remove. I know that a man is responsible for the acts of his agent within the scope of his authority; but I know of no law which makes one human being responsible for the offenses of another. Such a law comes very close to lawlessness ; so close that it makes me doubt whether such could have been the legislative will.
When a loyal citizen of the United States dies faithfully adhering to his Government it is his right to have his property and choses in action and claims and demands go to his widow or legatees or creditors or next of kin. That these or some of these may be disloyal is no concern of the Government$ its duty is to keep faith with its citizen who keeps faith with it, and if other people are guilty to prosecute them. If he leaves debts, it is his right that the money which the Government owes him shall go to liquidate them, for his creditors are not debarred by their disloyalty from prosecuting his estate. If his children are disloyal, it is still his right to let love and affection triumph over their faults. In short, the money which the Government owes him is his, and it is his right to do what he will with it. Confiscation, if it is to be asserted, must be asserted directly and against the guilty. The innocent has a right to the disposition of his own estate.
The Southern Claims Commission held that the loyalty to be established was neither that of the administrator nor that of the. decedent, but was that of the distributees. There was good sense in the decision, and the conclusion was justified by the language of the statute, which required the commissioners to be satisfied as to “ the loyalty and adherence of the claimant.” Their construction of it was reported to Congress, and received such legislative ratification as might well be inferred *210 from the adoption of their annual recommendations for many years.
The Supreme Court held in Carroll’s Case (13 Wall., 351) that the loyalty to be established was not the loyalty of the deceased owner, nor of the living distributees, but of the administrator who chanced to be in possession of the property at the time of its capture. That the rights of innocent women and children and the just purposes of a liberal and equitable law should be made dependent upon the accident of an administrator’s guilt or innocence was a doctrine which hitherto has done wonderfully little harm in the world; for it operated in the particular case before the court favorably to the widow and next of kin, and was accompanied by the doctrine of universal amnesty so applied as to relieve all claimants from the statutory obligations of pleading and proving loyalty. (Armstrong’s Case, 13 Wall., 154.) But concerning the decision as a present authority two things are to be said.
In the first place the Supreme Court decided a great deal more concerning claims and claimants under the Abandoned, or Captured Property Act (12 Stat. L., 820) than is set forth in the Carroll Case. This court had previously construed that act “ as a statute passed, midway in the rebellion, in the nature of a compact, whereby it was promised to those persons within rebel territory who should stand firm in their allegiance to the Government that their property, captured and forfeited by capture, should nevertheless be cared for by the Government* and its avails, on proof of compliance with the condition precedent of the compact, be restored to them. Hence this court held that the words in the statute ‘ aid or comfort to the rebellion’ related to the fact and not to the crime, and that pardon and amnesty, which obliterate crime, do not create a jurisdictional fact. The Supreme Court construed the statute as though it had been passed at the end of the rebellion, and ascribed the words ‘ and or comfort’ to the crime and not to the fact, and hence held that pardon or amnesty, obliterating the crime, left the citizen free to maintain his right of action.” (Withowski’s Case, 7 C. Cls. R., 393.)
In accordance with its construction of the statute, the Court of Claims held that11 the administrator seeking to recover as such stood in the stead of the decedent, representing his rights, entitled to his equities, and subject to his disabilities. *211 That his own interest in the estate as administrator was simply representative, and that the rights of the real parties in interest could neither be aided nor destroyed by his loyalty or disloyalty.” (Carroll’s Case, 7 C. Cls. R., 589.) In accordance with its construction of the statute, the Supreme Court held that as loyalty was not a jurisdictional fact, but a personal qualification, the loyalty of the administrator who possessed the property at the time of capture, and not the loyalty of the decedent who had left it to his widow and next of kin, was essential to maintaining the action.
Three years later, in the case of Villalonga (23 Wall., 35), the Supreme Court traveled back to the doctrine of the Court of Claims, sajing very truly, that a factor in possession, who has made advances on cotton, “is not the real owner ,” and has but “ a mere right to hold for a particular purpose.” That case had been decided by the Court of Claims with reluctance, in obedience to the principle of the Supreme Court’s decision in the Carroll Case, viz, that a person in possession of property at the time of capture, lawfully entitled to possession, and capable of maintaining an action of replevin against all the world, must be deemed the owner and entitled to recover the proceeds within the intent of the Abandoned or Captured Property Act. Such, also, was the case of Villalonga. He was in possession, he was entitled to possession, and could have maintained an action of replevin against all the world, including his principal, the owner of the property. The distinction between the two cases was a distinction of words; that the one party was an administrator and the other á factor; an artificial distinction based on neither a right nor a principle. Whatever substantial difference there was between the two claimants was in favor of Villalonga, for he had some interest of his own in the property, real and equitable, while the administrator, as such, had none at all. He would be obliged to pay the whole of the proceeds over to distributees; but Villalonga would only have to account to his principal for a surplus, which, after deducting his advances, commissions, expenses, and interest, might be nothing. Nevertheless the Supreme Court, while applying the equity rule originally held by the Court of Claims, saw fit to uphold its previous decision in the Carroll Case, by drawing a distinction; and to maintain this distinction, said, as logically it had to say, that the administrator was “the full legal owner, *212 entitled both in law and in equity to the entire property.” With all respect to that tribunal, I say that a person who acquired possession of property by no legal right, who had no equity or interest of his own in the property, who had to give security before he could get possession of it, who was th e mere representative of a court of probate, who could be deprived of the possession at any time in the discretion of the court, and the object of whose office find possession was that he might hold the property for the benefit of the persons really entitled to it — I say that such a person had not the vestige of a right in equity.
In the second place, Congress, in the enactment of the Bowman Act, have done everything that the law making power could do, save that of referring to the courts by their proper names, to re-establish the doctrine of the Court of Claims, and to obliterate the refinements of the common law which ruled the administration of the Abandoned or Captured Property Act in the Supreme Court. Congress have declared in the most unmistakable manner (1) that disloyalty refers to the fact and not to the crime; (2) that loyalty is not a personal qualification, but a jurisdictional fact; (3) that the loyalty to be established is not that of the person who happens to bring the action, but the person from whom the property was acquired. These provisions are the very essence of the rule of decision by which the Court of Claims administered the Abandoned or Captured Property Act. Congress saw clearly that when the Government took a man’s property during the war in hostile territory his allegiance was a vital, a jurisdictional fact; that if he were loyal it was taking the property of a citizen; if he were disloyal it was taking the property of an enemy. In the one case a contract arose from the taking within the iutent of the statute, and he. became entitled to compensation; iu the other, where a man had not adhered in his allegiance, he was in the plight of a public enemy with whom no contract could be implied, and to whom no compensation could become due. Congress also saw clearly that the fanciful refinement of the common law which holds that the pardon of the sovereign closes the eyes of the judiciary to see the guilt of the party had nothing to do with the fact of allegiance. Hence Congress, in the most unmistakable manner, declared loyalty to be aj urisdictional fact, and not only so declared, but moreover required this jurisdictional fact to be found by the court on a preliminary examination as a condition precedent to maintaining the action.
*213 It is true that the Bowman Act (§ 4) speaks of the person “ from whom such supplies or stores were taken.” But this cannot be understood literally. The statute does not say this alone. What it does say is “ that the person who furnishes, such supplies or stores” shall allege and prove his loyalty. But as there were cases where it might be held that the loyal owner had not “furnished ” stores for the use of the Army, the alternative provision was added “or from whom such supplies or stores were taken.” The former clause refers to cases in the nature of an express contract; the latter to cases in the nature of an implied; but the loyalty to be established in both cases is the loyalty of the person with whom the Government really dealt.
The property may have been taken from a teamster, or from a warehouseman, or from a factor, or from an administrator; but where the rights of the beneficiary are involved, or where the rights of the Government are involved, the teamster, the carrier, the warehouseman, the factor, the guardian, the trustee, or the administrator is nothing more than the legal custodian of the property. Any one of them could maintain an action of replevin against a wrong-doer, but no one of them could come into a court of equity and say that he was the owner as against the beneficiary whom he represents. In dispensing the justice upon which this statute rests, Congress is a court of equity dealing with the realities of life and not with the fictions of the common law. As a court of equity, it is the province of Congress to deal with the real parties in interest, just as other courts of equity look upon the assignee of a chose in action as the owner, or upon the ward or the beneficiary as having a better right than the guardian or the trustee; and a rule which prevents Congress from dealing with the real parties in interest is a rule which prevents Congress from dispensing justice.
In the case now under consideration the rights of the real parties in interest have been ascertained and fixed. They are the parties whose rights I have been considering — the widow and children of the decedent. By a decree of the chancery court of Mississippi it is adjudged that there are no debts outstanding against the estate, that the estate is (dosed except as concerns this claim,-and that the administrator shall, upon the *214 collection thereof, divide it pro rata among the heirs and dis-tributees — that is to say, the widow and children.
But in all cases, in contemplation of law, administration is primarily for the widow and next of kin; first, because they have a small but certain interest in the estate to the exclusion of creditors; second, because when the debts of creditors are discharged all that is left of the estate comes back to them. If the Government refuses to pay a debt which it owes to the estate, the creditors will still have their remedy against the estate, and the loss in the end will be the loss of the widow and next of kin. 80 long as an estate is not absolutely insolvent they are the beneficiaries, and the right to money due from, the Government is theirs. Where an estate is absolutely insolvent so that nothing will come to them, they are not the beneficiaries, and to such cases this opinion does not extend.
If there be any virtue in the Bowmau Act it is in the fact that the remedy, unlike the remedies of a court of law, is absolutely flexible. In all eases, as in this, the distributees can be ascertained and their rights be fixed. If the loyalty of any one cannot be established it will be his misfortune; and if there are debts outstanding or complications which will render the action of the administrator doubtful, Congress, in awarding a remedy, like a court of equity, can disregard the nominal plaintiff and decree payment directly and by name to the real parties in interest, or to such of them as are clearly entitled to relief.
I am therefore constrained to the conclusion that a general rule of law which operates, not from adverse circumstances in some exceptional case, but in all cases where the widow and next of Mn are ¡parties in interest, to make their rights dependent upon the guilt or innocence of an administrator was not the will of Congress.